**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MATTHEW CRUCCO, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs<br><br>  v.<br><br>APPLE INC.<br><br>    Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Page**

I    INTRODUCTION ..................................................................................... 1

II.   PARTIES ................................................................................................ 4

   A.  Plaintiff ........................................................................................... 4

   B.  Defendant ........................................................................................ 5

III.  JURISDICTION AND VENUE .............................................................. 5

IV.  TRADE AND COMMERCE ................................................................... 7

V.   CLASS ALLEGATIONS ........................................................................ 7

VI.  STANDING AND ANTITRUST INJURY ............................................. 9

VII. TOLLING OF THE STATUTES OF LIMITATIONS .......................... 10

   A.  The Statutes of Limitations Did Not Begin to Run Because Plaintiff
      Did Not and Could Not Discover The Claims .................................... 10

   B.  Apple's Fraudulent Concealment Tolled the Statutes of Limitations ....... 11

VIII. APPLE HAS MONOPOLY POWER IN THE RELEVANT MARKETS ........ 12

   A.  The Relevant Markets Are Performance Smartphones and Smartphones .......... 12

     1.  Performance Smartphones Are a Relevant Product Market ............. 12

     2.  Smartphones Are a Broader, Alternative Relevant Product Market ............. 14

   B.  The United States Is a Relevant Geographic Market ............................ 14

   C.  Apple Has Monopoly Power in the Performance Smartphone and
      Smartphone Markets in the United States ......................................... 15

IX.  APPLE ILLEGALLY PRESERVES ITS MONOPOLY POWER ............ 20

X.   ANTICOMPETITIVE EFFECTS ........................................................... 21

i

A.   Apple's Conduct Harms Competition…..……………………………………………..21

B.   Apple Has Every Incentive to Use Its Monopoly Tactics Indefinitely ............................. 26

XI.  PRIVACY, SECURITY, AND OTHER ALLEGED COUNTERVAILING
     FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE ACTIONS.................. 27

XII. CLAIMS FOR RELIEF ........................................................................................... 29

COUNT ONE
Monopolization of the Performance Smartphone Market in the United States
Sherman Act, 15 U.S.C. § 2........................................................................................ 29

COUNT TWO
Attempted Monopolization of the Performance Smartphone Market in the United States Sherman
Act, 15 U.S.C. § 2 (In the Alternative) ....................................................................... 30

COUNT THREE
Monopolization of the Smartphone Market in the United States
Sherman Act, 15 U.S.C. § 2........................................................................................ 31

COUNT FOUR
Attempted Monopolization of the Smartphone Market in the United States
Sherman Act, 15 U.S.C. § 2 (In the Alternative)......................................................... 33

XIII.  PRAYER FOR RELIEF ...................................................................................... 34

XIII.  JURY TRIAL DEMANDED ............................................................................... 35

Plaintiff Matthew Crocco ("Plaintiff") brings this class action on behalf of himself and all other similarly situated direct purchasers against Apple Inc. ("Apple"). Plaintiff brings this case to address Apple's anticompetitive and exclusionary conduct and alleviate harm to competition and consumers. Plaintiff alleges as follows, based on personal knowledge as to himself and belief as to all others.

## I        INTRODUCTION

1.        Apple Inc. is the biggest smartphone maker in the United States. It has gotten to this position through anticompetitive means and has used anticompetitive actions to unlawfully sustain a monopoly of the smartphone market. Apple's objective, as stated by Steve Jobs in 2010, has been to "lock customers into [Apple's] ecosystem" and "make Apple['s] ecosystem even more sticky"[1] by building technological and other impediments that make it hard for users to switch to alternative mobile devices. Rather than competing on the merits through price and innovation, Apple sought to snare users on its platform, locking them into iPhone usage and deterring alternative products.[2]

2.        On March 21, 2024, the Antitrust Division of the U.S. Department of Justice and a number of states filed a lawsuit against Apple for violations of Section 2 of the Sherman Act, specifying internal documents that depict Apple's anticompetitive actions. In competitively healthy markets, companies change their products to win business against competitive threats by making their own devices better, cheaper, safer, and more secure. Apple's approach is in contravention of such healthy competition. To wit, Apple builds unnatural impediments to keep users from buying devices from its competitors. The main tenet of Apple's approach to "get people

---

[1] *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J. filed Mar. 21, 2024) ("DOJ Complaint"), ¶ 3.

[2] DOJ Complaint, page 3.

hooked to the ecosystem," as one Apple executive phrased it, was to restrain technologies and innovation that would make it smoother for users to change to a different device ecosystem (*i.e.*, replace an iPhone with another manufacturer's device). By locking in its customer base, Apple severely impairs competition from actual and potential smartphone makers, thereby causing higher prices, lower quality, less innovation, fewer choices, and lower quality output.

3.      Apple preserved a monopoly of the smartphone market by restraining five main technologies that otherwise would have boosted competition:

- **Super Apps**: Super apps can host a multitude of programs and device features and thereby serve as a gateway to accessing the functionality of a smartphone. The difficulty for Apple is that super apps expedite the switching of devices by letting users switch to other devices (made by Apple competitors) with the same super apps. Recognizing that super apps lessen costs and impediments to switching, Apple has obstructed them through a number of technological and contractual restraints.

- **Cloud Streaming Game Apps**: Apple obstructed cloud streaming gaming apps for similar reasons. Cloud streaming game apps let users play games in the cloud, lessening the importance of costly hardware like Apple's. To hinder cross-platform competition, Apple constrained cloud streaming game apps on its smartphones.

- **Messaging Apps**: Seeing that high-quality messaging apps with cross-platform functionality would endanger its monopoly, Apple degrades the functionality of third-party messaging apps. Apple restricts cross-platform messaging in part to reinforce "obstacle[s] to iPhone families giving their kids Android phones."

- **Smartwatches**: Apple also has made the Apple Watch incompatible with competitor smartphone devices, such as Android phones, while deliberately degrading the functionality of third-party cross-platform smartwatches. By making the Apple Watch incompatible with other smartphones, Apple makes switching even more costly; an Apple user would not only need to purchase a new phone, but a new smartwatch as well.

- **Digital Wallets**: Digital wallets store payment information and permit users to pay by "tapping" their smartphone on a payment terminal. Apple has prevented third-party digital wallets from accessing the technologies necessary to perform tap payments using Apple's devices. Apple has thus ensured that only its own proprietary and Apple-specific app—Apple Pay—can give this functionality.

4.       Apple's actions restrain new paradigms that endanger its smartphone supremacy. The cloud, if unrestricted by Apple's anticompetitive schemes, could allow high-end functionality on a lower-priced smartphone, or make users care little about which brand their device was. As an Apple manager recently stated, "Imagine buying a [expletive] Android for 25 bux at a garage sale and it works fine . . . . And you have a solid cloud computing device. Imagine how many cases like that there are." By ensnaring consumers within its proprietary ecosystem, Apple has restrained competition from other manufacturers to sustain a durable monopoly over the smartphone market. And Apple has exploited its monopoly power to overcharge hundreds of millions of consumers on smartphones, causing Apple to reap historic returns.

5.       Apple deters competition by designing iPhones to block cross-platform technologies between iPhones and Android smartphones in order to solidify, establish, and/or increase Apple's smartphone monopoly. In order to pursue its supracompetitive profits, Apple has blocked features and innovation on its iPhone resulting in Apple making the iPhone worse for consumers to prevent competition from emerging, which has the effect of unlawfully inflating the price of the iPhone. While Apple claims that it has prohibited the design and installation of cross-platform technologies on its smartphone platform for purposes of "security" and "privacy" interests, this is mere pretext. Apple has engaged in course of conduct designed to deter competition in the smartphone markets in order to obtain monopoly rents and supracompetitive profits on the iPhone.

6.       Presently, Apple charges upwards of $1,599 for an iPhone, earning a high margin on each sale. Further, when developers invent a new product or service for iPhone users, Apple demands up to 30% of the price of such app, even though Apple played no part in creating it. Then, when a consumer buys another product or service within that app, Apple takes up to *another* 30%,

again for something Apple took no part in creating or developing. The effect is higher prices for American consumers and less innovation for smartphone apps.

7.      Apple defends its monopoly with a series of restrictions that it would not be able to dictate in a competitive market. When customers buy milk or pay for other groceries, Apple charges a fee for every "tap-to-pay" transaction, imposing its own expensive interchange fee on financial institutions. When an iPhone user conducts an internet search, Google shares some of the advertising revenue generated by the search with Apple. Consumers like Plaintiff, who purchased iPhones at supracompetitive prices and have been deprived of innovation in a competitive smartphone market, suffered injury from Apple's anticompetitive practices.

8.      Plaintiffs and the putative Classes have overpaid or otherwise suffered economic losses due to Apple's monopolization of these markets and therefore sue for damages, injunctive relief, and other relief Plaintiff thus undertakes to represent a Class of individuals who bought iPhones directly from Apple. Plaintiff demands a trial by jury and treble damages, injunctive relief, and other appropriate relief based on Apple's illegal monopolization.

## II.     PARTIES

### A.     Plaintiff

9.      Plaintiff Matthew Crocco ("Plaintiff") is a resident of the State of California and the county of Los Angeles.  Plaintiff purchased an iPhone 11 directly from Defendant Apple, probably at the Grove Apple Store in Los Angeles, California back in April 2019  Plaintiff then purchased an iPhone 12 directly from Defendant Apple in Chandler Fashion Center Apple Store in Chandler, Arizona in approximately November 2020  Plaintiff also purchased an iPhone 13 directly from Defendant Apple in Chandler Fashion Center Apple Store in Chandler, Arizona in approximately March 2022.

**B.     Defendant**

10.     Apple Inc. is a California corporation with its headquarters at One Apple Park Way, Cupertino, California 95014. Apple is a worldwide technology company and one of the world's most valuable public companies with a market capitalization of over $2.5 trillion.

11.     The iPhone is the main driver of Apple's growth and profitability. Apple gains profit margins of more than 30% on devices alone—significantly higher than its smartphone competitors. iPhone sales have made up a majority of Apple's annual revenue every year since 2012.

12.     Apple increasingly earns revenue from iPhone users after the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (*e.g.*, Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions), accessories (*e.g.*, tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling its computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users buy and download apps. In recent years, Services have made up a larger share of Apple's revenues, even as U.S. consumers continue to access these services primarily through the iPhone.

### III.     JURISDICTION AND VENUE

13.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C §§ 15 & 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. 2, and pursuant to N.J.S.A. 56:9-10(b) and 56:9-12(a).

14.     The Court has federal subject matter jurisdiction over this action pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337, since the action alleges violations of section 2 of the Sherman Act, 15 U.S.C. § 2, that are actionable under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

15.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of Apple.

16.     This Court has personal jurisdiction over Apple, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and under 28 U.S.C. §§ 1391 because it intentionally directed its business activity toward this jurisdiction and had substantial contacts with this jurisdiction.

17.     Apple engages in, and its activities substantially affect, interstate trade and commerce. Apple provides a range of products and services that are marketed, distributed, and offered to consumers throughout the U.S., including the states in which Plaintiff and the Classes reside, across state lines, and internationally.

18.      Apple engages in, and its activities substantially affect, interstate trade and commerce. Apple provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, including the states in which Plaintiff and the Classes reside, across state lines, and internationally.

## IV.    TRADE AND COMMERCE

19.    Apple's actions alleged in this Complaint occurred within the flow of interstate commerce, including in this District, and were intended to and did have a direct and substantial effect upon such commerce.

20.    Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies which has generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

21.    Apple designed, manufactured, sold, and shipped iPhones in a continuous and uninterrupted flow of interstate commerce throughout the U.S., which included sales of iPhones in this District, advertisement of iPhones in media in this District, and employment of sales personnel in this District. Apple's actions had and continue to have a direct, substantial, and reasonably foreseeable effect on interstate commerce throughout the U.S., including commerce within this District.

## V.    CLASS ALLEGATIONS

22.    Plaintiff brings this action for damages and injunctive relief on behalf of themselves and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23 (b)(2) (injunctive relief) and (b)(3) (damages), with the class initially defined to include:

**National Class:** All persons or entities that purchased an iPhone directly from Apple; either individuals or entities, other than for resale, anytime between March 21, 2020 through the present (the "Nationwide Class"). The Class excludes the Defendant and any of its current or former parents, subsidiaries, affiliates, officers, directors, and employees. The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

23.     While Plaintiff does not know the exact number of class members, the nature of the trade and commerce at issue indicates that there are millions of class members across the U.S., such that joinder of all class members in the prosecution of this action is impracticable.

24.     Plaintiff's claims are typical of the claims of the other class members because Plaintiff purchased an iPhone directly from Apple.

25.     Numerous questions of law or fact common to the entire class arise from Apple's anticompetitive and illegal actions, including, without limitation:

a. Whether there is a relevant antitrust product market for smartphones;

b. Whether there is a relevant antitrust product market (or submarket) for performance smartphones;

c. Whether Apple has illegally monopolized the smartphone and/or performance smartphone markets;

d. Whether purchasers and users of smartphones have been injured, including by having paid more for smartphones than they would have in the absence of Apple's anticompetitive conduct;

e. Whether Apple employed unfair practices in the conduct of its business;

f. Whether Plaintiff and class members are allowed injunctive and corresponding declaratory relief to halt Apple's illegal actions; and

g. Whether Plaintiff and class members are allowed damages or restitution.

26.     These and other questions of fact and law are common to the class and predominate over any questions affecting class members individually.

27.     Plaintiff will fairly and adequately represent the interests of the class. Each Plaintiff purchased an iPhone directly from Apple within the U.S. and has no conflicts with any other

member of the class. Plaintiff has retained sophisticated and competent counsel experienced in prosecuting antitrust class actions.

28.     Apple has acted on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the class as a whole.

29.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will remove the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

30.     The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Apple.

## VI.     STANDING AND ANTITRUST INJURY

31.     Plaintiff purchased iPhones directly from Apple at inflated prices that resulted from Apple's anticompetitive and monopolistic practices, as alleged in this Complaint. Apple therefore caused Plaintiff to incur overcharge damages.

32.     Charging supracompetitive prices to direct purchasers like Plaintiff was the purpose and direct effect of Apple's alleged monopolization actions. Plaintiff has standing as a direct purchaser of products and services sold to Plaintiff by Apple at inflated prices. Plaintiff is an efficient enforcer of the antitrust laws who suffered harm that flows from what makes Apple's business practices described in this Complaint antitrust violations.

33.     Because Apple continues to engage in the anticompetitive conduct alleged herein, Plaintiff is reasonably likely to incur future overcharges when hepurchases additional or replacement smartphones.

34.     Both the actual harm and the threat of future harm to Plaintiff are cognizable antitrust injuries directly caused by Apple's violations. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

## VII.    TOLLING OF THE STATUTES OF LIMITATIONS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover The Claims

35.     Before the filing of the Department of Justice's complaint against Apple, Plaintiff and class members had no knowledge of Apple's anticompetitive actions, or of facts sufficient to place them on inquiry notice of the claims asserted herein.

36.     Plaintiff and class members paid for iPhones at artificially inflated prices or otherwise suffered economic harm as a result of Apple's wrongful exercise of monopoly power in the relevant markets.

37.     Other than dealing directly with Apple when purchasing their iPhones or other Apple products, Plaintiff had no direct contact or interaction with Apple and had no means from which he could have discovered its wrongful actions.

38.     There was no information in the public domain sufficient to put Plaintiff and class members on notice that Apple had unlawfully acquired a monopoly or was using its monopoly power to charge supracompetitive prices for its products.

39.     It was reasonable for Plaintiff and class members not to suspect that Apple was engaging in any illegal anticompetitive conduct.

40.     Plaintiff alleges a continuing course of illegal actions by Apple, including actions within the applicable limitations periods. Those actions have inflicted continuing and accumulating injury.

41.     For these reasons, the statutes of limitations applicable to Plaintiff's and class members' claims have been tolled with respect to the claims asserted herein.

**B.      Apple's Fraudulent Concealment Tolled the Statutes of Limitations**

42.     Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's claims. Plaintiff and class members had no knowledge of Apple's unlawful acquisition and maintenance of monopoly power in the relevant markets, or of facts sufficient to place them on inquiry notice of his claims. No information in the public domain or otherwise available to Plaintiff and class members suggested that Apple had unlawfully acquired a monopoly or was using its monopoly power to charge supracompetitive prices for its products.

43.     Apple hid its illegal actions, both by failing to disclose its unlawful acquisition and maintenance of a monopoly through exclusionary acts in the relevant markets, and by affirmatively denying that it was engaged in such conduct. Apple has (repeatedly) publicly denied allegations by U.S. and foreign regulators that it was abusing its market power and engaging in anticompetitive or other illegal actions in the relevant markets. The market for consumer electronic products like iPhones is subject to antitrust regulation, so it was reasonable for Plaintiff and class members to presume that iPhones were sold in a competitive market. A reasonable person under the circumstances would not have suspected iPhones were being sold at supracompetitive prices at any time before these claims accrued or before the Department of Justice filed its lawsuit on March 21, 2024.

11

44.     Because Apple's antitrust violations were self-concealing and affirmatively hidden by Apple, Plaintiff and class members had no knowledge of Apple's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Apple of having unlawfully acquired and maintained monopoly power. Therefore, by operation of Apple's fraudulent concealment, the statutes of limitations applicable to Plaintiff's and class members' claims were tolled.

## VIII.   APPLE HAS MONOPOLY POWER IN THE RELEVANT MARKETS

45.     Apple has monopoly power in the market for performance smartphones. All smartphones compete against each other in an overarching relevant market. But industry participants, including Apple, measure competition among smartphones in narrower markets that amount to submarkets of the larger all smartphone market.

46.     The market for performance smartphones is the appropriate market. Market participants, including Apple, do not believe entry-level smartphones competitors to be a reasonable substitute for performance smartphones. Apple makes the choice not to compete to sell new smartphones in the entry-level tier. The most relevant market to assess its actions therefore excludes this tier.

47.     No matter how the relevant market is looked at, as set forth below, Apple holds monopoly power.

### A.     The Relevant Markets Are Performance Smartphones and Smartphones

#### 1.     Performance Smartphones Are a Relevant Product Market

48.     Performance smartphones are a relevant product market within the overarching smartphone market. This narrower market includes those smartphones that compete with most

12

iPhones and excludes the lowest-end smartphones, which are sometimes referred to as "entry-level" smartphones within the industry.

49.     Industry participants recognize performance smartphones as distinct. They commonly aggregate smartphones into tiers that include entry-level smartphones and higher tiers such as "premium" or "flagship." Apple has long recognized a distinction between these higher-end smartphones and lower-end, entry-level smartphones. Apple's own documents show it does not believe entry-level smartphones are competing with the iPhone and other performance smartphones.[3]

50.     Performance smartphones have distinct features and uses as compared to other smartphones. For example, entry-level smartphones are usually made with lower-quality materials and are less durable (*e.g.*, plastic instead of metal and glass). They have lower-performance parts, such as slower processors and lower-capacity storage, which prohibit users from running more intensive applications or storing large volumes of pictures and data. Entry-level smartphones frequently lack characteristics such as an NFC antenna allowing consumers to use their phone to make payments or access passes for public transit.

51.     Because of these differences, *inter alia*, between entry-level smartphones and performance smartphones, entry-level smartphones are not reasonable substitutes for performance smartphones. Further, competition from non-performance smartphones is not enough at present to prevent Apple from exercising monopoly power in the performance smartphone market.

---

[3] *See* DOJ Complaint, ¶ 167.

### 2.   Smartphones Are a Broader, Alternative Relevant Product Market

52.    Smartphones also are a relevant product market, and are distinct from mobile phones that offer inferior hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer simple internet browsing in addition to calling and messaging features, but do not offer the wide range of access to the internet or third-party apps as smartphones. Likewise, these phones often have lower-quality hardware, such as poorer displays or cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

53.    Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of portability, size, and function that consumers rely on in a smartphone, even if they offer some of the same functions. Thus, none of these other products are reasonable substitutes for smartphones.

54.    Apple, other participants in the market, and the public recognize that smartphones are different from feature phones and other portable devices.

55.    Competition from feature phones, or other alternatives, is not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

### B.   The United States Is a Relevant Geographic Market

56.    The United States is a relevant geographic market for the sale of performance smartphones and smartphones. Users in the U.S. rely on services offered by U.S. telecommunications companies when they buy a smartphone. While Apple sells smartphones globally, its users remain geographically limited. Most U.S. consumers in the market for performance smartphones use their phones in the U.S. U.S. consumers who buy a smartphone need

14

a service plan with a U.S. telecommunications company to connect the phone to cellular and mobile networks.

57.     In addition, potential new smartphone entrants to the U.S. market must abide by telecommunications regulations and other legal requirements. Some international smartphone makers are effectively prohibited from offering their smartphones to U.S. consumers.

58.     Consumers in the U.S. could not avert or defeat an increase in the price of performance smartphones or smartphones by buying and importing smartphones from outside the U.S. Thus, Apple sets prices for a smartphone in the U.S. separately from the same smartphone in other countries. For example, Apple reduced the price of the iPhone 11 in China relative to the U.S. because Apple encountered greater competition in China. The additional competition derived in part from a popular super app placing competitive pressure on Apple and making it easier for users to switch from an iPhone to a rival smartphone. Thus, competition in China prohibits Apple from commanding the same prices for the iPhone in China that it does in the U.S.

**C.     Apple Has Monopoly Power in the Performance Smartphone and Smartphone Markets in the United States**

59.     Apple has monopoly power in the smartphone and performance smartphone markets because in each of these markets, Apple has the power to control prices or eliminate competition. Also, Apple has consequential and durable market shares in these markets. Apple's market shares likely underestimate Apple's power since they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to push away competition from rival platforms and innovations, products, and services that may lessen consumer reliance on the iPhone. Apple's power likely will increase.

60.     Apple can set prices without regard to competition. The price of an iPhone has increased greatly over the years. When released in June 2010, an iPhone 4 cost $199. The iPhone 15—released in 2023—started at $799 for a base model, $899 for a Plus model, $999 for "X" and "Pro" models, and $1,199 for a "Pro Max" model.

61.     Apple's profits and profit margins, for almost every aspect of the iPhone, further show Apple's monopoly power. Apple's per-unit smartphone profit margins far surpass those of its next most profitable rival. Apple charges cellular carriers much more than its competitors to buy and resell its smartphones to the public, and uses contract clauses that may hinder the ability of carriers to promote competitor's smartphones, a harmful use of monopoly power that is mostly hidden from view. Apple also extracts large fees from developers—as much as 30% when users buy apps or make in-app payments. Apple also charges developers added fees to promote their apps in the App Store. This is one of the fastest-growing parts of Apple's services business, with revenue "increasing by more than a third to $4.4B in FY 2022.

62.     Apple takes a .15% commission from banks on credit card transactions via its digital wallet; a practice not employed by any of its competitors with similar digital wallets. Apple anticipates that it will collect almost $1 billion in global revenue from Apple Pay fees by 2025. A recent report by the U.S. Consumer Financial Protection Bureau states that these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

63.     These indicators of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

64.     Apple's market shares in the smartphone and performance smartphone markets are durable. Apple's U.S. market share by revenue is over 70% in the performance smartphone market and over 65% for all smartphones. Over the past 10 years these market shares have stabilized.

65.     Apple's smartphone market shares understate Apple's supremacy and likely growth in key demographics, including among younger American consumers. One-third of all American iPhone users were born after 1996, as compared to just 10% for Samsung, Apple's nearest smartphone rival.[4] Also, iPhone users usually come from higher income households.[5] Because smartphone users commonly use a single smartphone to access related products and services, Apple's key user groups allow it to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to competitors, and exercise more control over developers and other market participants.

66.     Almost all app developers consider iPhones and Android devices as complements, not substitutes, since developers need to build apps that run on both platforms for single-homing consumers. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality enhances Apple's power over developers that seek to reach users on smartphones—especially performance smartphones running complicated apps.

67.     Apple's power over developers, in turn, further attaches iPhone buyers to Apple's ecosystem by lessening users' ability to transfer their apps and data to non-Apple devices, making it hard if not impossible for users to switch away from Apple devices. And as existing iPhone users commit to Apple, new smartphone buyers are less likely to buy a non-Apple smartphone as a

---

[4]   https://www.tomsguide.com/news/the-iphone-is-no-1-with-gen-z-by-far-and-social-fear-is-a-big-reason-why (last accessed 4/17/24)

[5] https://www.marketingdive.com/news/survey-iphone-owners-spend-more-have-higher-incomes-thanandroid- users/541008/ (last accessed 4/17/24)

substitute for an iPhone because buying an iPhone allows them to interact more smoothly with friends and family who already have iPhones. For these and other reasons, any prospective demand cross-elasticity between iPhones and other smartphones does not prevent Apple from imposing monopolistic prices on iPhone purchasers.

68.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. With fewer than 10% of smartphone purchasers in the U.S. buying their first smartphone,[6] fewer new customers are available for Apple's competitors. Instead, competitors must encourage existing iPhone users to switch to another smartphone when they replace or upgrade their phone. Hence, switching costs—many of which Apple creates or exploits—impose large barriers to entry and expansion for rival smartphone manufacturers. These barriers are growing ever more impenetrable. According to the DOJ Complaint, one U.S. cellular carrier estimates that in a given quarter, as many as 98% of iPhone users on its network replace or upgrade their iPhone with another iPhone. These extremely high retention rates stem from the increased switching costs for consumers due to Apple's monopoly power and anticompetitive actions.

69.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning also. For example, bringing to market a new smartphone requires significant investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens. In addition to supply, other major barriers to entry include manufacturing, software development, product design, regulatory approval, marketing, and customer service. Further, because consumers frequently buy smartphones through mobile carriers, new entrants or those seeking to expand or reposition must meet the carriers' technical requirements to access the major carrier networks in the U.S. New entrants and smaller competitors

---

[6] https://www.pewresearch.org/internet/fact-sheet/mobile/ (last accessed 4/17/24)

also must negotiate distribution agreements and induce carriers and other retailers to promote their products to consumers.

70.     Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs. An iPhone user who changes to an Android smartphone faces significant financial, technological, and behavioral obstacles to switching. The user may need to transfer huge amounts of data (e.g., contacts), purchase new apps, transfer or buy new subscriptions and accessories, and re-learn how to operate their smartphone using a new interface. These switching costs are even higher when the different devices and operating systems cannot communicate and interoperate using software applications, APIs, and other functionality.

71.     These barriers to entry prevented many large, well-financed companies from entering the relevant markets. Amazon released its Fire mobile phone in 2014 but could not profitably sustain its business and left the following year. Microsoft discontinued its mobile business in 2017. LG exited the smartphone market in 2021. Today, only Samsung and Google remain as non-Apple participants in the U.S. performance smartphone market. Barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

72.     Direct indicators prove Apple's monopoly power. For example, Apple can and does profitably forgo innovation without fear of losing customers to rivals. In February 2020, Apple's vice president of iPhone marketing stated: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [sic] already doing *more* than what would have been good enough." After identifying old features that "would have been good enough today if we hadn't introduced [updated

features] already," she explained, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone." In other words, because of Apple's monopoly, American consumers receive smartphone innovation that is only "good enough," instead of the best possible innovation as vigorous competition would yield.

## IX.    APPLE ILLEGALLY PRESERVES ITS MONOPOLY POWER

73.    While indispensable to the success of the iPhone, developers and accessory makers also pose an existential threat to Apple's enormous profits by empowering consumers to "think different" and choose perfectly functional, more affordable, and potentially more innovative and attractive alternative smartphones. Apple's smartphone business model, at its core, invites as many participants as possible, including iPhone users and third-party developers, to join its platform and insists on contractual terms that impose a major tax. Simultaneously, Apple restricts its platform participants' power to negotiate or compete on price through alternative app stores, in-app payment processors, and more. Apple delays, degrades, or outright prevents technologies that would allow competition in the smartphone markets, including by decreasing barriers to switching to another smartphone. The suppressed technologies would provide a high-quality user experience on any smartphone, which in turn would require smartphones to compete on their merits, and on price.

74.    Apple suppresses innovation through contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process. Moreover, Apple denies access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its position as an incumbent intermediary between product creators such as developers, on the one hand, and users on the other.

75.     To preserve its smartphone monopoly—and the enormous profits that monopoly creates—Apple consistently chooses to make its products worse for consumers to prohibit competition from emerging. The non-exhaustive examples summarized below, individually and collectively, have contributed to Apple's ability to acquire and preserve its smartphone monopoly, including by increasing switching costs for users, leading to higher prices, fewer choices, reduced output, and less innovation for users and developers alike. Apple has used one or both mechanisms (control of app distribution or control of APIs) to suppress the following technologies, among others: super apps, Cloud streaming game apps, messaging apps, smartwatches, and digital wallets.

76.     By sustaining its monopoly of the smartphone market, Apple harms consumers in several additional ways. For example, by denying iPhone users the ability to choose a trusted banking app as their digital wallet, and instead forcing users to use only Apple-authorized products in the digital wallet, Apple keeps control over both the consumer and the stream of income generated. Apple also prevents the creation and use of alternative app stores designed to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features, subject to competitive innovation, would aid consumers and allow them to decide what smartphone to buy and what apps and products to utilize. Allowing consumers to make these choices, however, is an impediment to Apple's ability to preserve its monopoly.

## X.     ANTICOMPETITIVE EFFECTS

### A.     Apple's Conduct Harms Competition

77.     Apple protects its monopoly power in smartphones and performance smartphones by utilizing its control over app distribution and app creation to suppress or delay apps, innovations, and technologies that would lessen user switching costs or simply allow users to discover, purchase, and use their own apps and content without having to rely on Apple. As a

result, Apple has less competition from competitor smartphones and less competitive pressure from innovative, cross-platform technologies, not because Apple makes its own products better but because it makes other products worse. Due to the lack of competition, Apple collects enormous profits and regulates innovation to serve its interests. These monopoly tactics leave all smartphone users worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and others. Left unchallenged, Apple will continue to utilize and strengthen its longstanding smartphone monopoly to determine how companies can create and distribute apps in the future so that they cannot threaten Apple's supreme competitive position.

78. Apple's actions have yielded less choice for smartphone users. Presently, only two companies (Google and Samsung) remain as significant competitors to Apple's monopoly share of the premium smartphone market. And Apple's actions have increased the technical, behavioral, monetary, and other costs of switching from an iPhone to an alternative smartphone. This undermines competition and entrenches Apple's monopoly power.

79. According to user surveys, one of the main reasons iPhone users today do not switch to rival smartphones is to avoid the problems Apple has created for cross-platform messaging.[7] Likewise, Apple exercised its control over app distribution and app creation to hinder the development and growth of super apps, depriving users of technology that would have eased switching by decreasing a user's dependence on the iPhone platform. Apple took a similarly restrictive approach to cloud streaming apps, suppressing technology that would have made it easier for users to switch to less expensive smartphones. Apple also used its control over app

---

[7] *See* https://www.wsj.com/articles/why-apples-imessage-is-winning-teens-dread-the-green-text-bubble-11641618009 (last accessed 4/17/24)

creation, including its control over critical APIs, to force technical and contractual restrictions on messaging apps, third-party smartwatches, and digital wallets, heading off cross-platform technologies that would have helped users overcome switching costs and friction in a more competitive market.

80.    Apple also has delayed or suppressed the emergence of cross-platform technologies that would limit Apple's ability to collect enormous profits from users and developers. For example, if developers could distribute their programs via super apps or cloud streaming apps, rather than the App Store, Apple's ability to control app distribution and app creation would be lessened, and it could not impose the same exorbitant taxes on developers wanting to distribute apps to iPhone users. Similarly, third-party digital wallets, or other apps with tap-to-pay functionality, would benefit users and developers by putting more competitive pressure on Apple. Digital wallets eventually could provide developers an alternative way to process payments and manage customer relationships, forcing Apple to compete more aggressively by lowering fees and improving quality, ultimately benefiting users. Instead, when users pay for something with their phone, Apple continues to exercise its power over customers and financial institutions.

81.    Apple's actions have injured users in other ways. For example, third party digital wallets could provide smartphone users better rewards (*e.g.*, cash back), as well as a more private, secure payment experience from a user's preferred financial institution as opposed to a payment mediated by Apple. But because of Apple's anticompetitive activity, these tap-to-pay digital wallet products and services are not in existence presently.

82.    Apple's actions have made its own products worse, forfeiting the short-term profits Apple could earn from improving the iPhone to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the

development of popular apps and accessories for iPhone users, which in turn would make iPhones more attractive and more valuable to users. But, as set forth above, Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps and cloud streaming apps, because they threaten Apple's smartphone monopolies. As a result, several developers have discontinued plans to develop super apps and cloud based gaming apps even after investing in bringing them to market. Similarly, Apple degrades third-party messaging apps, even though doing so makes cross-platform messaging less private and less secure for iPhone users, because the smooth and reliable use of these third-party apps would reduce switching costs for users interested in a non-iPhone smartphone. Apple has also impeded innovation by third party smartwatches, causing manufacturers to limit the functionality of their smartwatches for iPhone users. These third-party firms have suspended support for iPhone compatibility because of Apple's restrictions or discontinued development of cross-platform smartwatches altogether. At least one company's discontinued smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Apple's actions may have also delayed the development of innovative apps related to education, artificial intelligence, and productivity.

83.     Apple's actions have harmed other smartphone users, too. Because of the resources and risks required to sustain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, restrained by Apple Wallet and its various limitations, prospective digital wallet providers, including U.S. banks, have discontinued the development of digital-wallet apps for either Apple or other smartphones.[8] Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features

---

[8] DOJ Complaint, ¶ 132.

related to the key in Apple Wallet rather than allowing the key to be placed solely in the company's own app.[9] Other developers have discontinued plans to launch super apps, cloud-streamed gaming apps, smartwatches, and other apps. As a result, all smartphone users have lower quality smartphones with less innovation, decreased quality, lower output, and less choice.

84.    Apple's documents and actions show that Apple is motivated by the anticompetitive purpose of building and preserving monopoly power in the relevant markets. For example, Apple forfeited significant revenues it could have earned from super apps, mini programs, cloud streaming apps, and other third-party apps and accessories. In particular, mobile gaming already accounts for a large and growing portion of Apple's revenue. Popular cloud streamed gaming apps would offer iPhone users access to popular services (including games) and in turn create substantial revenue for Apple through subscriptions and in-app purchases. Instead, Apple preferred the long-term benefit of reduced smartphone competition to the revenue it would create from cloud gaming, super apps, and mini programs or the increases in quality (and consumer demand) that would follow from this innovation. Apple has also leveraged its control over app distribution and app creation to selectively undermine cross-platform technologies, not because this helps protect users but because it helps protect Apple.

85.    The harms to smartphone competition caused by Apple's actions are magnified by Apple's decision to grant itself exclusive distribution rights to iPhone users through the Apple App Store. If Apple allowed users to access apps in other ways, users could choose an app store that did not restrict super apps or mini programs, even if Apple otherwise ran its App Store as it does today. Apple does not allow that choice, however, because if it did, developers could write their programs for any smartphone rather than specifically for iOS—just as internet browsers and

---

[9] *Id.*

Apple's QuickTime allowed developers to write programs that worked on a variety of operating systems, not just Windows. If Apple were to permit access to apps other than through the App Store, the result would be lower switching costs for users and less dependence by users and developers upon Apple and the iPhone.

86.     Apple's smartphone monopoly gives it many ways to preserve its power even in the face of interventions designed to prevent specific anticompetitive practices. This is because Apple's iPhone monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which most smartphone users buy digital and hardware products, and by which developers are allowed to sell these same products to users. If Apple has to change some of these rules, it has the power to adopt new rules, restrictions, or features that reinforce Apple's monopoly and harm competition in other ways. For example, Apple has stated plans to adopt RCS due to market and international regulatory pressure. But Apple continues to contractually restrict third parties from accessing other APIs and features that would allow cross-platform messaging apps. In another instance, Apple was prevented from enforcing certain anti-steering provisions in its agreements with developers. In response, Apple simply created a different set of onerous restrictions on app developers to achieve a similar result. In other cases, Apple has used its control over app distribution to force companies to comply with Apple's policies that may be in contravention of local laws by delaying the review of the offending companies' apps.

**B.      Apple Has Every Incentive to Use Its Monopoly Tactics Indefinitely**

87.     Apple's actions pose significant risk to the development of new innovations. Absent court intervention, Apple may use its smartphone monopoly tactics to acquire or preserve power over next-frontier devices and technologies. As Apple increases its supremacy, it may

continue delaying or hindering the innovations of cross-platform companies to lock users into Apple devices.

88.     Apple has numerous products and services—AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash. These provide future ways for Apple to engage in anticompetitive actions and the ability to circumvent remedies. Appropriate forward-looking remedies are necessary to ensure that Apple cannot use these products and services to further entrench its monopoly power.

## XI.     PRIVACY, SECURITY, AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE ACTIONS

89.     There is no valid, procompetitive benefit of Apple's exclusionary actions that would outweigh its anticompetitive effects. Apple's actions have not resulted in lower prices, higher quality-adjusted output, improved innovation, or a better user experience for smartphone users.

90.     Apple markets itself by invoking user privacy and security to distinguish itself from what limited competition exists in the smartphone market. Neither privacy nor security justifications provide a legitimate excuse for Apple's monopolistic and anticompetitive actions. Apple imposes contractual restrictions on app creation and distribution, imposes high fees on many types of smartphone interactions, and conditionally restricts API access on its smartphone platform simply because it can do so. There are limited if any competitive constraints on these actions. Apple's control over app distribution and creation on the iPhone is much more restrictive than necessary to protect user privacy and security. By way of comparison, Apple does not engage in such actions on its Mac laptops and computers. It instead gives developers the freedom to distribute software directly to consumers on Mac without using an Apple-controlled app store and without paying Apple app store fees. Mac users still enjoy a safe and secure experience.

91.     In fact, many alternative technologies that Apple's actions suppress could or would enhance user security and privacy. For example, Apple's actions targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider, or other trusted third party. When an iPhone user provides a credit or debit card in Apple Wallet, Apple intervenes in a process that could otherwise occur directly between the user and card issuer, introducing an additional point of failure for privacy and security. Likewise, super apps or alternative app stores could offer users and their families a more detailed selection of apps that better protect user privacy and security. Apple, in fact, allows enterprise and public sector customers to offer more detailed app stores on employee iPhones because this better protects privacy and security.

92.     Apple is also willing to make the iPhone less secure and less private if that helps preserve its monopoly power. For example, text messages sent from iPhones to Android phones are unencrypted as a result of Apple's actions. If Apple had the desire, Apple could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would instantly improve the privacy and security of iPhone and other smartphone users. Apple's intentional failure to encrypt cross-platform text messaging reveals Apple's privacy justification as a thinly veiled effort to provide cover for its true business goal of securing its monopoly over U.S. smartphones.

93.     Apple is willing to forfeit user privacy and security where doing so benefits Apple. For example, Apple allows developers to distribute apps through its App Store that collect huge amounts of personal and sensitive data about users— including children—at the expense of its users' privacy and security. Apple also enters agreements to share in the revenue generated from advertising that relies on harvesting users' personal data. For example, Apple accepts enormous

payments from Google to set its search engine as the default in the Safari web browser even though other search engines better protect user privacy.

94.     Apple also selectively enforces its rules and contractual restrictions for app distribution and app creation. For example, when it benefits Apple to do so, Apple permits developers to introduce mini programs, stream content from the cloud, use virtual currency, and receive special permissions or access APIs not automatically available to everyone.

95.     Apple chooses to make the iPhone private and secure when doing so benefits Apple but follows alternative courses when they help Apple preserve its monopoly power. Apple's actions underscore the pretextual nature of any claim that its market share or restrictions could be justified by protecting user privacy or security.

## XII.   CLAIMS FOR RELIEF

### COUNT ONE
**Monopolization of the Performance Smartphone Market in the United States
Sherman Act, 15 U.S.C. § 2**

96.     Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

97.     Performance smartphones in the U.S. are a relevant antitrust market, and Apple has monopoly power in that market.

98.     Apple has willfully monopolized and unlawfully preserved such monopoly of the performance smartphone market in the U.S. through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, preserved, or protected its performance smartphone monopoly.

99.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have hindered apps and

technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The segments detailed in this complaint reflect a non-exhaustive list of recent anticompetitive acts; as technology advances, both the technologies restricted and the particular type of restriction may change in response to technological and regulatory change consistent with Apple's past actions.

100.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and consumers.

101.    Apple's exclusionary actions lack a procompetitive justification that offsets the harm caused by Apple's anticompetitive and illegal conduct.

102.    As a result of Apple's anticompetitive conduct, Plaintiff and the class paid supracompetitive prices for iPhones purchased in the U.S.

**COUNT TWO**
**Attempted Monopolization of the Performance Smartphone Market in the United States**
**Sherman Act, 15 U.S.C. § 2 (In the Alternative)**

103.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

104.    Performance smartphones in the U.S. are a relevant antitrust market, and Apple has tried to monopolize that market.

105.    Apple has tried to monopolize the performance smartphone market in the U.S. through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market.

106.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have hindered apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The segments detailed in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies restricted and the particular type of restriction may change in response to technological and regulatory change consistent with Apple's past actions.

107.     While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

108.     In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to prohibit effective competition in, the performance smartphone market in the U.S. There is a dangerous probability that, unless restricted, Apple will be successful in monopolizing the performance smartphone market in the U.S., in violation of Section 2 of the Sherman Act.

109.     Plaintiff and the class are entitled to damages for Apple's attempted monopolization in an amount to be proven at trial.

**COUNT THREE**
**Monopolization of the Smartphone Market in the United States**
**Sherman Act, 15 U.S.C. § 2**

110.     Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

111.     Smartphones in the U.S. are a relevant antitrust market, and Apple has monopoly power in that market.

112.    Apple has willfully monopolized and illegally preserved such monopoly of the smartphone market in the U.S. through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, preserved, or protected its smartphone monopoly.

113.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have hindered apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The segments detailed in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies restricted and the particular type of restriction may change in response to technological and regulatory change consistent with Apple's past actions.

114.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

115.    Apple's anticompetitive acts have had harmful effects on competition and consumers.

116.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and illegal conduct.

117.    As a result of Apple's anticompetitive conduct, Plaintiff and the class paid supracompetitive prices for iPhones purchased in the U.S.

## COUNT FOUR
### Attempted Monopolization of the Smartphone Market in the United States
### Sherman Act, 15 U.S.C. § 2 (In the Alternative)

118.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

119.    Smartphones in the U.S. are a relevant antitrust market, and Apple has attempted to monopolize that market.

120.    Apple has attempted to monopolize the smartphone market in the U.S. through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

121.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have hindered apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The segments detailed in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies restricted and the particular type of restriction may change in response to technological and regulatory change consistent with Apple's past actions.

122.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

123.    In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone market in the U.S. There is a dangerous probability that, unless restricted, Apple will be successful in monopolizing the smartphone market in the U.S., in violation of Section 2 of the Sherman Act.

124.    Plaintiff and the class are entitled to damages for Apple's attempted monopolization in an amount to be proven at trial.

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the class, respectfully requests that the Court enter judgment by adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff serving as the Class Representative and his counsel serving as Class Counsel;

B. Apple has monopolized in violation of the Sherman Act;

C. Plaintiff and the class have been harmed in their business and property as a result of Apple's violations;

D. Plaintiff and the class are entitled to recover treble damages, and that judgment in favor of Plaintiff and the class be entered against Apple in an amount subject to proof at trial;

E. Plaintiff and the class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

F. Plaintiff and the class are entitled to equitable relief sufficient to remedy Apple's past and ongoing restraints of trade, including:

i. A judicial declaration of the rights of Plaintiff and the class, and the corresponding responsibilities of Apple; and

ii. Issuance of a permanent injunction against Apple and its parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein;

G. Plaintiff and the class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

H. Plaintiff and the class receive such other or further relief as the Court deems just and appropriate under the circumstances.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38 (b), for all claims and issues so triable.

Dated: April 18, 2024

**GLANCY PRONGAY & MURRAY LLP**


By:____/s/ Lee Albert
**GLANCY PRONGAY & MURRAY LLP**
Lee Albert (NJ Atty. ID 026231986)
Brian Murray *(Pro Hac Forthcoming)*
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lalbert@glancylaw.com
bmurray@glancylaw.com

Francis J. Flynn, Jr. (*Pro Hac Forthcoming*)
Law Office Of Francis J. Flynn, Jr.
6057 Metropolitan Plz
Los Angeles CA  90036
Telephone: (314) 662-2836
casey@lawofficeflynn.com

*Attorneys for Plaintiff and the Proposed Class*